# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### SHREVEPORT DIVISION

| | |
|---|---|
| **DARRYL DERAMUS** | **CIV. ACTION NO. 5:21-02566 SEC. P** |
| **VERSUS** | **JUDGE TERRY A. DOUGHTY** |
| **CLAIBORNE PARISH DETENTION CENTER, ET AL.** | **MAG. JUDGE KAYLA D. MCCLUSKY** |

## REPORT AND RECOMMENDATION

Before the undersigned magistrate judge, on reference from the District Court, is a motion for summary judgment [doc. # 44] filed by Defendants, Claiborne Parish Sheriff Sam Dowies, Dusty Williams, and Bobby Morgan.   The motion is opposed.   For reasons set forth below, it is recommended that the motion for summary judgment be GRANTED.

## Background

On or about August 12, 2021, Plaintiff pro se Darryl DeRamus ("DeRamus"), who, during the relevant period, was a pretrial detainee at the Claiborne Parish Detention Center ("CPDC"), filed the instant, *in forma pauperis* complaint to vindicate his civil rights under, *inter alia*, 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc, *et seq.* (Compl. [doc. # 1]).   He named the following Defendants in their individual and official capacities:   the CPDC, Sheriff Sam Dowies ("Sheriff Dowies"), Warden Dusty Williams ("Williams" or "Warden Williams"), Lieutenant Bobby Morgan ("Morgan" or "Lt. Morgan"), and Lieutenant Shanti Glass.   *Id.*   Pursuant to court order, DeRamus filed an amended complaint on November 22, 2021.   [doc. #s 7-8].

In his Complaint, as amended, DeRamus alleged that he is a "Rastafarian Muslim" and that cutting his hair violated his religious beliefs, his constitutional rights, the RLUIPA, and the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb, *et seq.*   [doc. #s 1, pg. 13;

8, pg. 2].   He alleged that when he arrived at the CPDC on October 21, 2020, Lt. Morgan informed him that he must cut his hair because it "was too long and against the policy of the jail."   [doc. # 1, pg. 13].   DeRamus disclosed "[his] religious faith and beliefs as a Rastafarian Muslim" and made Morgan "aware of the burden on [his] religious and cultural exercise. [sic]." [doc. # 8, pg. 2].   However, when DeRamus refused to cut his hair, Lt. Morgan stated, "[d]on't worry I got something for you" and instructed another correctional officer to place him in administrative segregation.   [doc. # 1, pg. 13].   DeRamus contends that his placement in administrative segregation and his forced haircut constitute retaliation.   [doc. # 8, p. 2].   He blames Sheriff Dowies for "making a policy that all inmates must keep short hair . . ."   *Id.* at 17.

DeRamus remained in administrative segregation for almost one month from October 21, 2020, to November 19, 2020, when he was "forced" to cut his hair.   [doc. #s 1, pg. 13; 8, pg. 2]. He claims to have suffered emotional distress because of the foregoing and blames Warden Williams for failing to intervene to stop Lt. Morgan.   [doc. #s 1, pg. 17; 8, pg. 2].

DeRamus also alleged that, during his month-long stint in administrative segregation, he was not allowed to use a telephone to call family and friends.   [doc. #s 1, pg. 13; 8, pg. 2].   He lacked stationery, an envelope to use to write to his family, hygiene items, a toothbrush, toothpaste, soap, and materials to clean his cell and toilet.   *Id.*   He could not shower because he lacked hygiene items and a change of clean clothes.   [doc. # 8, pgs. 2-3].   Consequently, he "was forced to wear soiled and dirty clothes during [his] stay."   *Id.*

DeRamus claims that, when he arrived at the CPDC, Sheriff Dowies and Warden Williams failed to ensure that he received "clothing such as underwear, t-shirts, socks, [or] shower shoes . . .," which he needed "so he c[ould] have some clothes to put on while he sen[t] dirty and soiled clothes to the laundry to be washed."   [doc. # 1, pgs. 14, 17].

DeRamus seeks a declaratory judgment, injunctive relief, nominal damages of $1.00,

2

punitive damages in the amount of $50,000 per individual defendant, attorney's fees, and any other relief to which he is entitled. [doc. # 1, pgs. 18-19].

On December 22, 2021, the undersigned conducted an initial review of DeRamus's pleadings and recommended dismissal of all claims and parties except the following: (1) a RLUIPA claim against Sheriff Dowies, in his official capacity; (2) a retaliation claim against Lt. Morgan for placing DeRamus in administrative segregation after he refused to submit to a haircut; and (3) a conditions-of-confinement claim against Williams and Morgan. (Report and Recommendation ("R&R") [doc. # 9]). On January 11, 2022, the District Court adopted the R&R and entered a corresponding judgment. (Judgment [doc. # 11]).

On April 14, 2023, remaining Defendants, Sheriff Dowies, Warden Williams, and Lt. Morgan (collectively, "Defendants") filed the instant motion for summary judgment seeking dismissal of DeRamus's claims against them. DeRamus filed his opposition to the motion on May 4, 2023. (Pl. Opp. Brief [doc. # 46]). Sheriff Dowies, Warden Williams, and Lt. Morgan filed a reply brief on May 19, 2023. (Defs. Reply [doc. # 49]). Accordingly, the matter is ripe.

## Summary Judgment Standard

Summary judgment is appropriate when the evidence before the court shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.*

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

3

any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting *Anderson*, 477 U.S. at 247). "The moving party may meet its burden to demonstrate the absence of a genuine issue of material fact by pointing out that the record contains no support for the non-moving party's claim." *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002). Thereafter, if the non-movant is unable to identify anything in the record to support its claim, summary judgment is appropriate. *Id.*

In evaluating the evidence tendered by the parties, the court must accept the evidence of the non-movant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255. While courts will "resolve factual controversies in favor of the non-moving party," an actual controversy exists only "when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air. Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). There can be no genuine dispute as to a material fact when a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322-323. The non-moving party may not rely merely on the allegations and conclusions contained within the pleadings; rather, the non-movant "must go beyond the pleadings and designate specific facts in the record showing that there is a genuine issue for trial." *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996). The non-movant does not satisfy his burden merely by demonstrating some metaphysical doubt as to the material facts, by setting forth conclusory allegations and unsubstantiated assertions, or by presenting but a scintilla of evidence. *Little*, 37 F.3d at 1075 (citations omitted).

Moreover, "summary judgment is appropriate in *any* case 'where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the

nonmovant.'" *Id.* (citation omitted) (emphasis in original).    In sum, "[a]fter the non-movant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the non-movant, summary judgment will be granted." *Mississippi River Basin Alliance v. Westphal*, 230 F.3d 170, 174 (5th Cir. 2000) (citation omitted).

<u>Analysis</u>

I.    **Available Remedies**

Defendants seek dismissal of DeRamus's claims for declaratory and injunctive relief because he no longer resides at the CPDC, and, therefore, the claims are moot.    In his deposition, DeRamus admitted that, on January 28, 2023, he was transported from Louisiana to Wisconsin, a state where he intends to reside following his release from custody.    (DeRamus Depo., pgs. 10-14; MSJ, Exh. 1 [doc. # 44-1]).    He further disavowed any intent ever to return to Louisiana.    *Id.*

DeRamus's transfer out of the CPDC, with no reasonable possibility of return, renders his claims for injunctive and declaratory relief under § 1983 and RLUIPA moot.    *Coleman v. Lincoln Par. Det. Ctr.*, 858 F.3d 307, 309 (5th Cir. 2017) (citations omitted); *Hoffman v. Thaler*, 539 Fed. App'x. 507, 510 (5th Cir. 2013) (citation omitted).    Moot claims are subject to dismissal, without prejudice, for lack of subject matter jurisdiction.    *Salcido v. Wilson*, No. 21-11029, 2022 WL 1564188, at *1 (5th Cir. 2022) (unpubl.).

Defendants also seek dismissal of any claims by DeRamus for compensatory damages stemming from mental or emotional injury.    The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(e), provides that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act (as

defined in section 2246 of Title 18)."   "[I]t is the nature of the relief sought, and not the

underlying substantive violation, that controls:   Section 1997e(e) applies to all federal civil

actions in which a prisoner alleges a constitutional violation, making compensatory damages for

mental or emotional injuries non-recoverable, absent physical injury."   *Geiger v. Jowers*, 404

F.3d 371, 375 (5th Cir. 2005).

Plainly stated, the PLRA "prevents prisoners from seeking compensatory damages for

violations of federal law where no physical injury is alleged."   *Mayfield v. Texas Dep't Of

Criminal Justice*, 529 F.3d 599, 605–06 (5th Cir. 2008) (citing *Geiger v. Jowers,* 404 F.3d 371,

375 (5th Cir.2005) (per curiam)).   Further, "[t]he 'physical injury' required by § 1997e(e) 'must

be more than de minimus [sic], but need not be significant.'"   *Harper v. Showers*, 174 F.3d 716,

719 (5th Cir. 1999) (*quoting Siglar v. Hightower*, 112 F.3d 191, 193 (5th Cir. 1997)).   The

PLRA's physical injury requirement for recovery of compensatory damages also applies to

claims under the RLUIPA.   *Warner v. Wright*, 434 Fed. App'x. 333, 335 (5th Cir. 2011) (citing,

*inter alia*, *Geiger v. Jowers,* 404 F.3d 371, 375 (5th Cir. 2005)).

In his deposition, DeRamus conceded that, other than being "scalped," he did not suffer

any bleeding, scars, or physical injury on account of his forced haircut.   (DeRamus Depo., pgs.

76-77; MSJ, Exh. 1 [doc. # 44-1]).   Likewise, DeRamus did not attribute any medical issues to

the conditions of confinement that he endured while he was in administrative segregation.   *Id*.,

pg. 123.   Accordingly, it is manifest that DeRamus has suffered no more than *de minimis*

physical injury, which precludes recovery of mental and/or emotional distress damages under §

1983 and the RLUIPA.   *See Warner v. Wright*, 434 Fed. App'x. 333, 335 (5th Cir. 2011);

*Hadley v. River Bend Det. Ctr.*, Civ. Action No. 18-0529, 2018 WL 3342059, at *2–3 (W.D. La.

May 22, 2018), *R&R adopted,* 2018 WL 3341790 (W.D. La. July 6, 2018), *affirmed,* 771 Fed.

App'x. 560 (5th Cir. 2019) (alleged damage to hair roots caused by grooming clippers was *de minimis*); *Mayfield v. Texas Dept. Of Criminal Justice,* 529 F.3d 599, 605-606 (5th Cir. 2008).

Defendants also urge the court to dismiss DeRamus's claims for punitive damages.   In *Coleman v. Lincoln Par. Det. Ctr.*, the Fifth Circuit broadly held that the "RLUIPA does not authorize a private cause of action for compensatory or punitive damages against [defendants] in their individual or official capacities."   *Coleman v. Lincoln Par. Det. Ctr.*, 858 F.3d 307, 309 (5th Cir. 2017) (citing *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 329–31 (5th Cir. 2009)).   The *Coleman* decision cited *Sossamon*, which, in turn, appeared to ground its holding on the RLUIPA's failure to abrogate *state* sovereign immunity from suits for monetary relief. *Sossamon,* 560 F.3dc at 329-31.

While there is no indication that Defendants here are state employees, neither were the defendants in *Coleman*.   *See Coleman*, 858 F.3d at 309.   Accordingly, this court is compelled to follow *Coleman* and find that DeRamus may not recover punitive damages on his RLUIPA claim against Sheriff Dowies, in his official capacity.[1]   *See Morgan v. Patterson*, 772 Fed. App'x. 117, 118 (5th Cir. 2019) (citing *Coleman* to support dismissal of claims under the RLUIPA because the statute does not authorize compensatory or punitive damages against defendants in

---

[1]  Furthermore, a claim against the sheriff, in his official capacity, is considered a claim against the local government entity or municipality, from which punitive damages are not recoverable under § 1983.   *See Lachney v. Linzay*, Civ. Action No. 16-1458, 2019 WL 4166843, at *5 (W.D. La. Aug. 30, 2019) (citing *City of Newport v. Fact Concerts*, 453 U.S. 247, 271 (1981)).   At least two of the considerations that supported the Supreme Court's decision in *City of Newport* to disallow punitive damages against municipalities under § 1983, also counsel against the availability of punitive damages against a local government entity under the RLUIPA.   *See City of Newport, supra*; *Moore v. LaSalle Corr., Inc*, 429 F.Supp.3d 285, 288 (W.D. La. 2019), *amended*, 2020 WL 13851424 (W.D. La. Feb. 19, 2020) (punitive damages may not be awarded against a municipality).

their individual or official capacities); *Blade v. Stinson*, Civ. Action No. 18-0697, 2018 WL 4926340, at *3 (W.D. La. Sept. 18, 2018), *R&R adopted,* 2018 WL 4924023 (W.D. La. Oct. 9, 2018) (same).[2]

Defendants further argue that DeRamus cannot recover nominal damages under the RLUIPA.   However, case law confirms the availability of nominal damages not only under the RLUIPA, but also § 1983.   *See Warner, supra*; *Watson v. Wakefield*, Civ. Action No. 08-0903, 2009 WL 3151320, at *8 (S.D. Tex. Sept. 25, 2009); *Uzuegbunam v. Preczewski*, 141 S.Ct. 792, 802; 209 L.Ed.2d 94 (2021) (nominal damages available for violation of constitutional right). Accordingly, DeRamus may proceed with his claim for nominal damages under the RLUIPA and § 1983.

Finally, because he not represented by an attorney, DeRamus is unable to recover attorney's fees.   *Danial v. Daniels*, 162 Fed. App'x. 288, 291 (5th Cir. 2006) (citation omitted); *Vaksman v. C.I.R.*, 54 Fed. App'x. 592 (5th Cir. 2002) (citation omitted).

## II.    The RLUIPA

The RLUIPA "prohibits imposing a substantial burden on an inmate's religious exercise unless that burden furthers a compelling interest and is the least restrictive means of furthering that interest." *Ware v. Louisiana Dep't of Corr.*, 866 F.3d 263, 267 (5th Cir. 2017) (citing 42 U.S.C. § 2000cc–1(a)).   The RLUIPA provides "very broad protection for religious liberty." *Holt v. Hobbs*, 574 U.S. 352, 356; 135 S.Ct. 853, 859 (2015) (quoted source omitted).

The plaintiff's initial burden under the RLUIPA is two-fold:   "he or she must show that

---

[2]  Williams and Morgan separately seek dismissal of DeRamus's punitive damages claims against them under § 1983 because DeRamus adduced no evidence to show that they possessed the requisite culpable state of mind.   However, in light of the court's recommended disposition of DeRamus's constitutional claims, *see* discussion, *infra*, punitive damages are unavailable.

(1) the relevant religious exercise is 'grounded in a sincerely held religious belief' and (2) the government's action or policy 'substantially burden[s] that exercise' by, for example, forcing the plaintiff 'to engage in conduct that seriously violates [his or her] religious beliefs.'"  *Ali v. Stephens*, 822 F.3d 776, 782–83 (5th Cir. 2016) (citations omitted).   If the plaintiff carries this burden, then the burden shifts to the government to "show that its action or policy (1) is in furtherance of a compelling governmental interest and (2) is the least restrictive means of furthering that interest."  *Id*. (citations omitted); *Ware,* 866 F.3d at 267.

The RLUIPA defines 'religious exercise' to include 'any exercise of religion, whether or not compelled by, or central to, a system of religious belief.'"  *Adkins v. Kaspar*, 393 F.3d 559, 567 (5th Cir. 2004) (quoting 42 U.S.C. § 2000cc–5(7)).   Thus, "the practice burdened need not be central to the adherent's belief system, but the adherent must have an honest belief that the practice is important to his free exercise of religion."  *Sossamon*, 560 F.3d at 332; *Adkins*, 393 F.3d at 570.

Further,

[a] *burden* is *substantial* if it truly pressures the adherent to significantly modify his religious behavior and significantly violate his religious beliefs.   A burden is not substantial if it merely prevents the adherent from either enjoying some benefit that is not otherwise generally available or acting in a way that is not otherwise generally allowed.

*Id*. (internal citations and quotation marks omitted).

Defendants argue that DeRamus is unable to prevail on his RLUIPA claim because he admitted that his practice of not cutting his hair and letting it grow into dreadlocks was, for him, a family cultural tradition, not a "religious exercise."   At his deposition, DeRamus testified that by November 2020, he had over one hundred dreadlocks, and he had not cut his hair since April

2008, i.e., almost thirteen years earlier.   (DeRamus Depo., pgs. 55-56).   He initially characterized his hair practice as his "religious belief as a Rastafarian Muslim . . ." and "part of [his] heritage and religious beliefs."   *Id*., pg. 59.   In response to further questioning, however, he explained that "Rastafarian" is "based more off the heritage and the lineage of African American people."   *Id*., pg. 60.   DeRamus then explained that Rastafarianism was "more of a cultural thing than an actual, I guess you could say, religion."   *Id*.   He added that growing a beard was related to Islam, whereas "the hair for Rastafarian, it's pretty much more of a cultural thing."   *Id*., pg. 61.   DeRamus also agreed that the source of the practice of growing dreadlocks was more of a "cultural practice that [came] from [his] roots and genealogy . . ."   *Id*., pgs. 61-62.   DeRamus further conceded that his religion was Islam, and, in addition, he adhered to the "cultural practices of Rastafarian."   *Id*., pg. 63.   Moreover, in his response to Defendants' summary judgment motion, DeRamus stated that he never denied being Muslim, but he also "practices the cultural faiths and beliefs of Rastafarians due to his genealogy and roots."   (Pl. Response, pg. 2).[3]

Upon consideration, the court finds that DeRamus has not adduced evidence to show that his practice of not cutting his hair and growing dreadlocks represented a religious exercise that was grounded in his sincerely held religious belief.   Quite simply, for DeRamus, his dreadlocks

---

[3] In his complaint, DeRamus alleged that he told Lt. Morgan that it was against his "religious beliefs" to cut his hair.   (Compl., pg. 13).   Furthermore, in his response to the motion for summary judgment, DeRamus swore under oath that all accounts in the civil suit were true and accurate.   (Pl. Response, pg. 1).   However, a party may not defeat a motion for summary judgment via an affidavit or declaration that impeaches, without explanation, sworn deposition testimony.   *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996) (citations omitted).   Thus, DeRamus cannot use his declaration to create a fact issue with his inconsistent, and more detailed sworn testimony.

were a cultural practice, not a religious exercise.   Accordingly, he has not met his initial burden

to support his RLUIPA claim, and that claim fails as a matter of law.

## III.    Leave to Amend

Perhaps realizing that his RLUIPA claim would not succeed, DeRamus then tried to pivot

in his legal theories in his response to the summary judgment motion by alleging that,

> [a]s a Muslim, he was neglected prayer times and practices due to his room being
> uncleaned/unkempt and knowing the time of Day.   It is against faith and laws of
> Islam to pray in filth or to be unclean.   "It prevents the angels from being present"
> or to pray outside prayer times.

(Pl. Opp., ¶6).

Defendants contend that DeRamus's new allegations represent an untimely attempt to

amend his complaint.   Indeed, the Fifth Circuit has recognized that a claim first raised in an

opposition to a motion for summary judgment should be construed as a motion to amend the

complaint under Rule 15 of the Federal Rules of Civil Procedure.   *Sherman v. Hallbauer,* 455

F.2d 1236, 1242 (5th Cir. 1972); *see also Riley v. Sch. Bd. Union Par.*, 379 Fed. App'x. 335, 341

(5th Cir. 2010).

Rule 15 of the Federal Rules of Civil Procedure provides that leave to amend shall be

"freely" granted "when justice so requires."   FED. R. CIV. P. 15(a)(2).[4]   Under Rule 15,

"[w]hether leave to amend should be granted is entrusted to the sound discretion of the district

court . . ." *Quintanilla v. Texas Television, Inc.*, 139 F.3d 494, 499 (5th Cir. 1998) (quoted source

and internal quotation marks omitted).   However, "[i]n the context of motions to amend

---

[4] Defendants analyzed DeRamus's proposed amendment under Rule 16's good cause standard
for modifying a scheduling deadline.   FED. R. CIV. P. 16(b)(4).   However, Defendants did not
identify any applicable deadline that DeRamus breached.   Accordingly, the court will consider
DeRamus's proposed amendment under Rule 15.

pleadings, 'discretion' may be misleading, because Fed. R. Civ. P. 15(a) 'evinces a bias in favor of granting leave to amend.'" *Martin's Herend Imports v. Diamond & Gem Trading United States of America Co.*, 195 F.3d 765, 770 (5th Cir. 1999) (quoting *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 597 (5th Cir. Nov. 1981)).   A district court must have a "substantial reason" to deny a request for leave to amend.   *Lyn-Lea Travel Corp. v. American Airlines, Inc.*, 283 F.3d 282, 286 (5th Cir. 2002) (citation omitted).

In deciding whether to grant a party leave to amend, the court considers the following factors:   1) undue delay, 2) bad faith or dilatory motive, 3) repeated failure to cure deficiencies by previous amendments, 4) undue prejudice to the opposing party, and 5) futility of the amendment.   *Rosenzweig v. Azurix Corp.,* 332 F.3d 854, 864 (5th Cir. 2003) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).   Absent any of these factors, leave should be granted.   *Smith v. EMC Corp.*, 393 F.3d 590, 595 (5th Cir. 2004) (citing *Foman*, 371 U.S. at 182).

Nonetheless, "[l]iberality in pleading does not bestow on a litigant the privilege of neglecting h[is] case for a long period of time."   *Matter of Southmark Corp.*, 88 F.3d 311, 315–16 (5th Cir. 1996) (quoted source omitted).   Thus, in exercising its discretion to deny leave to amend a complaint, the district court may consider "(1) an 'unexplained delay' following an original complaint, and (2) whether the facts underlying the amended complaint were known to the party when the original complaint was filed."   *Id*. (citations omitted).

Over two years ago, the undersigned specifically directed DeRamus to amend his complaint to state how and to what extent a specific defendant's actions limited or affected his exercise of religion.   (Oct. 22, 2021, Mem. Order [doc. # 7]).   In his amended pleading, DeRamus stated vaguely that he was not provided religious materials or religious services, before discussing his forced haircut.   (Amend. Compl. [doc. # 8]).   He made no mention of an

12

inability to pray because his room was unclean and/or because he did not know the time of day. Unsurprisingly then, the undersigned did not recognize such a claim.   *See* R&R [doc. # 9]. Moreover, DeRamus did not object or challenge this court's characterization of his claims, as distilled from his pleadings.

Instead, DeRamus waited more than seventeen months after his last amended pleading, and until Defendants had filed a motion for summary judgment, before seeking to amend his complaint to add an additional claim.   However, he proffered no explanation for the delay, despite the fact that he would have been well aware of the circumstances of the present claim at the time he filed his original and amended complaints.   In addition, Defendants will be unduly prejudiced by the delay because they already have taken DeRamus's deposition and will have to incur the expense to repeat the exercise, which is complicated by DeRamus's continued incarceration in Wisconsin.   Finally, given that DeRamus's remedy, should he prevail on his new claim, is limited to nominal damages, i.e., $1, *see* discussion, *supra*, the equities certainly do not favor amendment.

Accordingly, DeRamus's implied request for leave to amend complaint to add a new claim is denied.   *See Parish v. Frazier,* 195 F.3d 761, 763 (5th Cir.1999) (affirming district court's denial of leave to amend filed after defendant's motion for summary judgment and seven months after the original complaint, in part, because additional claims could have been raised in the original complaint).

## IV.    Section 1983 Claims

a)   The Individual/Official Capacity Dichotomy

A § 1983 suit may be brought against a party in that party's official or

individual/personal capacity, as well as against a government entity.  *Goodman v. Harris Cty.*, 571 F.3d 388, 395 (5th Cir. 2009).   A § 1983 *personal-capacity* suit seeks to impose liability on a "government officer for actions taken under color of state law."  *Hafer v. Melo*, 502 U.S. 21, 25, 112 S.Ct. 358 (1991) (emphasis added).   On the other hand, a suit against a party in that party's *official-capacity* is generally "another way of pleading an action against an entity of which an officer is an agent."  *Goodman v. Harris Cty.,* 571 F.3d at 395 (quoting *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691-94, 98 S.Ct. 2018, n.55 (1978). Therefore, an official-capacity suit is treated as a suit against the real party in interest—the government entity—and not against the official personally.  *Id.*   This type of claim also is known as municipal liability or a *Monell* claim.   *Edwards v. City of Balch Springs, Texas*, 70 F.4[th] 302, 307 (5th Cir. 2023).

"Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered."  *Valle v. City of Houston*, 613 F.3d 536, 542 (5th Cir. 2010) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986)). Moreover, the proper defendant for a § 1983 *Monell* claim is the "official or government body with final policymaking authority over the person who committed the violation."   *Lester v. Caddo Par.*, Civ. Action No. 15-2008, 2017 WL 6610329, at *6 (W.D. La. Dec. 27, 2017) (citing *inter alia*, *Burge v. Parish of St. Tammany*, 187 F.3d 452, 469 (5th Cir. 1999)). Therefore, an official capacity suit is viable *only* against the person(s) who is responsible for formulating official policy that caused the constitutional violation.   *Stuart v. Russell, et al.*, Civ. Action No. 21-01231, 2021 WL 4820244, at *4 (W.D. La. Oct. 15, 2021) (citations omitted).

Under Louisiana law, "[e]ach sheriff shall be keeper of the public jail of his parish."

LA. R. S. § 13:5539.   Consequently, under Louisiana law, a sheriff is considered the final policymaker of the public prisons of his or her parish.   *Johnson v. Gusman*, Civ. Action No. 18-11900, 2020 WL 3076662, at *3 (E.D. La. June 10, 2020).

In this case, DeRamus sued Claiborne Parish Sheriff Dowies, in his official capacity, who is the proper defendant for any municipal liability claims asserted against the CPDC.   Moreover, DeRamus did not adduce evidence to show that Warden Williams and/or Lt. Morgan were delegated "final policy making authority" for the actions at issue in this case, such that their decisions represent the official policy of the local government unit.   Accordingly, they may not be sued in their official capacities.   *Guillot on behalf of T.A.G. v. Russell*, 59 F.4th 743, 750–51 (5th Cir. 2023) (citations omitted); *see also World Wide St. Preachers' Fellowship v. Town of Columbia, La.*, Civ. Action No. 05-0513, 2008 WL 920721, at *9 (W.D. La. Apr. 3, 2008). Therefore, insofar as DeRamus sued Williams and/or Morgan, in their official capacities, the claims are subject to dismissal, as a matter of law.

b)  <u>Section 1983 General Principles</u>

Section 1983 provides that any person who, under color of state law, deprives another of "any rights, privileges or immunities secured by the Constitution and laws shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . ." *Harrington v. Harris*, 118 F.3d 359, 365 (5th Cir. 1997) (citing 42 U.S.C. § 1983).   Section 1983, however, does not create any substantive rights; it simply provides a remedy for the rights designated therein.   *Id*.   "Thus, an underlying constitutional or statutory violation is a predicate to liability under § 1983."   *Id*.   (citation omitted).

To state a cognizable claim for relief under 42 U.S.C. § 1983, "a plaintiff must plead

two—and only two—allegations . . . First, the plaintiff must allege that some person has deprived him of a federal right.   Second, he must allege that the person who has deprived him of that right acted under color of state or territorial law." *Arnold v. Williams*, 979 F.3d 262, 266-67 (5th Cir. 2020) (citation and internal quotation marks omitted).   Thus, a claim against a state actor *in his personal-capacity* need not be attributed to a governmental "policy or custom." *Hafer, supra*.

"The constitutional rights of a pretrial detainee . . . flow from both the procedural and substantive due process guarantees of the Fourteenth Amendment." *Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996) (*en banc*).   However, the Fifth Circuit's Fourteenth Amendment case law concerning pretrial detainees is based on the same Supreme Court's Eighth Amendment precedent pertaining to prisoners.   *Garza v. City of Donna*, 922 F.3d 626, 634 (5th Cir. 2019). Ultimately, then, "there is no significant distinction between pretrial detainees and convicted inmates concerning basic human needs . . ."   *Gibbs v. Grimmette*, 254 F.3d 545, 548 (5th Cir. 2001).

Constitutional challenges by pretrial detainees may be brought either as an attack on a "condition of confinement" or as an "episodic act or omission."   *Shepherd v. Dallas County*, 591 F.3d 445, 452 (5th Cir. 2009) (citing *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 644-45 (5th Cir.1996) (en banc)).   A "condition of confinement" case is a "[c]onstitutional attack[ ] on general conditions, practices, rules, or restrictions of pretrial confinement."   *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997) (en banc) (internal quotation marks and citation omitted).   A complaint may be analyzed as a "condition of confinement" claim when it challenges facility-imposed rules or policies that impact the detainee's prison environment; e.g., the number of

bunks in a cell, the revocation of television or mail privileges, cell overcrowding, and near 24 hour confinement.  *See Scott, supra* (and cases cited therein).

If the plaintiff properly characterizes his claim as an "attack on conditions of confinement, he is relieved from the burden of demonstrating a municipal entity's or individual jail official's actual intent to punish because . . . intent may be inferred from the decision to expose a detainee to an unconstitutional condition."  *Shepherd*, 591 F.3d at 452.   A condition usually reflects an explicit policy or restriction.  *Id*. (citation omitted).   However, in some cases, a condition may denote an "unstated or *de facto* policy, as evidenced by a pattern of acts or omissions 'sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by [jail] officials, to prove an intended condition or practice.'"  *Id*. (quoting *Hare,* 74 F.3d at 645).[5]   Ultimately, "to constitute impermissible punishment, the condition must be one that is 'arbitrary or purposeless' or, put differently, 'not reasonably related to a legitimate goal.'"  *Id*. (citing *Bell v. Wolfish,* 441 U.S. 520, 539, 99 S.Ct. 1861, 1874, 60 L.Ed.2d 447 (1979)).

Conversely, "where the complained-of harm is a particular act or omission of one or more officials, the action is characterized properly as an 'episodic act or omission' case and is not amenable to review under the *Wolfish* test."  *Scott*, 114 F.3d at 53 (citing *Hare,* 74 F.3d at 645).   "Because the focus of the claim is one individual's misconduct, the detainee is required to prove intent—specifically, that one or more jail officials 'acted or failed to act with deliberate

---

[5]   "Under *Monell,* a plaintiff must show either an official policy or persistent and widespread customs."  *Duvall v. Dallas Cnty., Tex.*, 631 F.3d 203, 208 (5th Cir. 2011) (citation omitted). There is no "meaningful difference" between the *Monell* burden and the showing required under *Wolfish* or *Hare*.  *Id.*

indifference to the detainee's needs.'"    *Shepherd*, 591 F.3d at 452 (citing *Hare,* 74 F.3d at 648).

A constitutional claim that alleges deliberate indifference to the conditions of a prisoner's confinement requires the plaintiff to satisfy both the "subjective and objective requirements" of the Eighth Amendment.    *Valentine v. Collier*, 956 F.3d 797, 801 (5th Cir. 2020) (citing *Farmer v. Brennan*, 511 U.S. 825, 846, 114 S.Ct. 1970 (1994)).    To meet the objective requirement, the plaintiff must show an "objectively intolerable risk of harm."    *Id*.    Furthermore, to satisfy the subjective requirement, the plaintiff must demonstrate that the defendant:    "(1) was 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists'; (2) subjectively 'dr[e]w the inference' that the risk existed; and (3) disregarded the risk."    *Id*.    (citations omitted).

In this case, DeRamus does not consistently categorize his claims as episodic or institutional/policy based.    Accordingly, the court must analyze each claim separately.    Before doing so, however, it is necessary to recite qualified immunity principles, which pertain to his episodic claims.

c) Qualified Immunity

When, as here, a plaintiff seeks money damages from government officials in their individual capacities under § 1983, i.e., for an episodic act, the affirmative defense of qualified immunity is available to protect defendants "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."    *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 815 (2009) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727 (1982)).    The qualified immunity doctrine balances two often conflicting interests:    "the need to hold public

18

officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id*. As such, "[t]he protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id*. (citations and internal quotation marks omitted).

In effect, qualified immunity "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Mendenhall v. Riser*, 213 F.3d 226, 230 (5th Cir. 2000) (citing *Malley v. Briggs,* 475 U.S. 335, 343, 341, 106 S.Ct. 1092 (1986) (internal quotation marks omitted).

Qualified immunity is nominally characterized as an affirmative defense. However, once raised by defendants, it devolves upon the plaintiff to negate the defense by showing that the official's conduct violated clearly established law. *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008) (citation omitted). Plaintiff's burden is two-pronged. *Club Retro LLC v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009) (quoted sources omitted). First, a plaintiff must demonstrate that defendant(s) violated a constitutional right under current law. *Id*. "Second, [plaintiff] must claim that the defendant[s'] actions were objectively unreasonable in light of the law that was clearly established at the time of the actions complained of." *Id*. (quoted source and internal quotation marks omitted). The courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." *Collier v. Montgomery*, 569 F.3d 214, 217 (5th Cir. 2009) (citation omitted).

A law is clearly established when there exists "controlling authority—or a 'robust

consensus of persuasive authority'—that defines the contours of the right in question with a high degree of particularity." *Hogan v. Cunningham*, 722 F.3d 725, 735 (5th Cir. 2013) (quoted source omitted).  Although a case directly on point is not required, "existing precedent must have placed the statutory or constitutional question *beyond debate*." *Id*.  (citations and internal quotation marks omitted).  Nonetheless, there is the "rare possibility that, in an obvious case, analogous case law is not needed because the unlawfulness of the [challenged] conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Joseph on behalf of Estate of Joseph v. Bartlett*, 981 F.3d 319, 330 (5th Cir. 2020) (citations and internal quotation marks omitted).

In the end, the question becomes whether the right is "sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right." *Hogan, supra* (citations and internal quotation marks omitted).  Because it is plaintiff's burden to establish that the challenged conduct violated clearly established law, the district court may, but is by no means obliged to undertake the clearly established law analysis on its own.  *See Joseph, supra*.

In the peculiar context of a motion for summary judgment, "once [the court has] determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record, the reasonableness of [an officer's] actions . . . is a pure question of law."  *Scott v. Harris*, 550 U.S. 372, 397, 127 S.Ct. 1769, 1776 n.8 (2007).  Consequently, the Fifth Circuit has recognized that,

> when facts are undisputed and no rational factfinder could conclude that the officer acted unreasonably, we can hold that an officer acted reasonably as a matter of law. But when facts are disputed and significant factual gaps remain that require the court to draw several plaintiff-favorable inferences, our analysis is more tentative.

In these cases, we must consider what a factfinder could reasonably conclude in filling these gaps and then assume the conclusion most favorable to the plaintiff.

*Lytle v. Bexar Cty., Tex.*, 560 F.3d 404, 411–12 (5th Cir. 2009) (internal citation omitted).

In other words, there is no constitutional violation if – even after crediting the version of facts most favorable to plaintiff – the officer's conduct was objectively reasonable.   *Id.*

d)  Discussion

i)  *Retaliation Claim Against Lt. Morgan*

To prevail on a claim of retaliation, a prisoner must establish "(1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for his or her exercise of that right, (3) a retaliatory adverse act, and (4) causation."  *Hope v. Harris*, 861 Fed. App'x. 571, 581 (5th Cir. 2021), *cert. denied,* 143 S.Ct. 1746 (2023) (citation omitted).   However, if the plaintiff has not suffered a constitutional violation, then the retaliation claim fails.  *Hicks v. Dowies*, Civ. Action No. 21-1896, 2023 WL 2527881, at *3 (W.D. La. Mar. 15, 2023).

Here, DeRamus alleged that Lt. Morgan retaliated against him by placing him in administrative segregation after he refused to submit to a haircut.   However, the court previously dismissed DeRamus's First Amendment claim pertaining to his dreadlocks and hair length.   (R&R, pg. 7).   Because DeRamus was not exercising a cognizable constitutional right when he refused to submit to a haircut, his retaliation claim necessarily fails as well.  *See id.* Furthermore, even if DeRamus had established that Lt. Morgan unlawfully retaliated against him, he has not adduced controlling authority to show that Morgan's conduct violated clearly established law at the time of his actions.  *See Sossamon*, 560 F.3d at 336 (plaintiff pointed to no cases that render the defendants' actions unreasonable in light of clearly established federal law).

Accordingly, Morgan is entitled to qualified immunity, dismissing DeRamus's retaliation

claim against him, as a matter of law.

    *ii)*  *Telephone Access Claim*

  At his deposition, DeRamus testified that, on Tuesdays and Thursdays, CPDC officers would circulate a telephone for the use of inmates housed in administrative segregation. (DeRamus Depo., pg. 35).   However, DeRamus was not permitted to use the telephone, purportedly by direction of Warden Williams.   *Id*.   This restriction notwithstanding, DeRamus managed to communicate with the outside world by having a fellow inmate make a telephone call(s) on his behalf.   *Id*., pgs. 71-72.[6]

  DeRamus's testimony unequivocally dispels any notion that there was an official policy by the Sheriff to restrict his telephone access.   Furthermore, he did not adduce any evidence to show Lt. Morgan's direct involvement in his deprivation.   Instead, DeRamus attributes his communication blackout to Warden Williams.

  However, the Fifth Circuit has held that the inability to make telephone calls from prison or a restriction to one call home every 60 days does not impinge upon a fundamental right.   *Hill v. Estelle*, 537 F.2d 214, 216 (5th Cir. 1976).   Moreover, DeRamus did not adduce any contrary, intervening authority to establish that Williams' conduct violated clearly established law at the time of her actions.   *See Sossamon,* 560 F.3d at 336.   Accordingly, Williams is entitled to qualified immunity, dismissing DeRamus's telephone access claim against her, as a matter of law.

---

[6] In fact, that is how DeRamus learned that he was the father of a newborn son, which also provided him with the impetus to have his hair shorn, so he could exit administrative segregation.   *Id*.

iii)    *Writing Materials*

In his pleadings, DeRamus alleged that he lacked stationery and envelopes to send letters to his family.   Moreover, he did not have access to the commissary to purchase these (or other) items during his roughly one-month stint in administrative segregation.   (DeRamus Depo., pgs. 81-82).

On the one hand, "[c]ourts have recognized that a prisoner has a right to send and receive mail under the First Amendment."   *Wells v. Thaler*, 460 Fed. App'x. 303, 310 (5th Cir. 2012) (citing, *inter alia, Thornburgh v. Abbott,* 490 U.S. 401, 407, 109 S.Ct. 1874 (1989)); *Daigre v. Maggio*, 719 F.2d 1310, 1313 (5th Cir. 1983) (prison mail restrictions infringe upon the First Amendment interests of both the prisoners and their would-be correspondents).   On the other hand, an inmate has no federal constitutional right to free postage to correspond with his family and members of the public.   *Lee v. Perry*, 993 F.2d 1543 (5th Cir. 1993), *but see Fountain v. Thaler*, 629 Fed. App'x. 592, 595 (5th Cir.2015), *abrogated on other grounds by Raskin on behalf of JD v. Dallas Indep. Sch. Dist.*, 69 F.4th 280 (5th Cir. 2023) (policy that deprived prisoner of adequate indigent general correspondence supplies and postage to correspond with his daughter sufficed to state a claim for violation of the First, Fourteenth, and Eighth Amendments).   Moreover, district courts regularly dismiss prisoner claims for failure to provide stamps and writing materials for the purpose of non-legal mail.   *See Follis v. Louisiana Workforce, LLC*, Civ. Action No. 23-0376, 2023 WL 4750890, at *2 (W.D. La. July 21, 2023); *Lowe v. Lee*, Civ. Action No. 17-0448, 2017 WL 6030045, at *6 (W.D. La. Oct. 23, 2017), *R&R adopted,* 2017 WL 6029635 (W.D. La. Dec. 4, 2017); and *Riggs v. Jordan*, Civ. Action No. 17-0473, 2017 WL 11716839, at *3 (W.D. La. Sept. 8, 2017).

Be that as it may, in response to Defendants' motion, DeRamus has not adduced evidence to show that his inability to obtain stationery and envelopes for the roughly one-month period that he was in administrative segregation reflected an official policy or practice of the Sheriff. Moreover, albeit in an old decision, the Fifth Circuit has held that a restriction on outgoing, non-legal mail by prisoners in punitive isolation serves an important government interest in maintaining discipline, and, therefore, does not violate the First Amendment. *Daigre,* 719 F.2d at 1313. Consequently, DeRamus's *Wolfish* and *Monell* claims against the Sheriff fail.

In addition, DeRamus has not established that Warden Williams and Lt. Morgan were personally responsible for, or aware of his denial of access writing materials. DeRamus admitted that he had no personal interaction with Williams. (DeRamus Depo., pgs. 101-102). DeRamus also only had three interactions with Morgan during his stint in administrative segregation: the first time was when Morgan placed him in the cell, the second time was one week before he left administrative segregation, and the last time was the day he left segregation. (Tr. 108-110). There is no indication that DeRamus complained to Morgan about his lack of stationery during these encounters.

Even if DeRamus had complained to Morgan at the time of the second or third encounters, an up to one-week long failure to provide stationery is not actionable. In the unlikely event that DeRamus told Morgan that he lacked writing materials contemporaneously with his initial placement in the cell, DeRamus admitted that Morgan was surprised when he later discovered, weeks later, that DeRamus remained in administrative desegregation. (DeRamus Depo., pgs. 108-109). In other words, because Morgan was under the impression that DeRamus's stay in segregation would be brief, he did not harbor the requisite intent to

24

deprive him of constitutional protections.

Finally, DeRamus has not adduced controlling authority to show that Williams or Morgan's conduct violated clearly established law at the time of their alleged actions. *See Sossamon,* 560 F.3d at 336*; Sligh v. City of Conroe, Texas, et al.,* No. 22-40518, 2023 WL 8074256, at *4 (5th Cir. Nov. 21, 2023) (when the case is not so obvious as to violate clearly established law without a body of relevant authority, plaintiff bears the burden of identifying precedent that clearly establishes his constitutional right). Accordingly, Williams and Morgan are entitled to qualified immunity, dismissing DeRamus's writing materials claim against them, as a matter of law.

### iv)  Hygiene Claim

DeRamus testified that, upon arrival at the CPDC, he received a jumpsuit. (DeRamus Depo., pgs. 35-37). However, he did not receive any other clothing, including an undershirt or briefs. *Id*., pgs. 35-42. While he admitted that he was allowed to take showers on Tuesdays and Thursdays and could receive a mini-soap bar upon request, he was not provided with wash cloths, towels, or a clean jumpsuit. *Id*. DeRamus also acknowledged that he had the option to send his jumpsuit out to be washed, but then he would have nothing to wear in the meantime. *Id*.

DeRamus further stated that he had trash under the bed and watered-down feces splattered on the wall. (Tr. 44-45). The trash under the bed included dust bunnies, a few potato chips, and old bread from sandwiches. *Id*. However, he managed to kick the stuff out of his cell when he returned from the shower.[7] *Id*., pgs. 46-47. The dried feces was splattered on the

---

[7] In other words, DeRamus did avail himself of the opportunity to take showers.

wall but limited to the area in the front, right portion of the cell.   *Id*., pgs. 103-105.   On several

occasions, DeRamus requested cleaning supplies or rags, but was denied.   *Id*., pg. 44.

Also, despite his requests, DeRamus was not provided with a toothbrush or toothpaste

during his confinement in the segregation cell.   (DeRamus, pgs. 106-107).   While he

theoretically could have used sink water to rinse his mouth, the water contained rust or some

other sediment, and, thus, was non-potable.   *Id*.   Instead, DeRamus had to consume water from

an Igloo cooler that he shared with other inmates in administrative segregation.   *Id*.

The Eighth Amendment forbids confinement under conditions that can lead to painful

and torturous disease with no penological purpose, including the deprivation of the basic

elements of hygiene and the failure to provide facilities for elementary sanitation.   *Daigre,* 719

F.2d at 1313 (citations omitted); *see also Gates v. Cook*, 376 F.3d 323, 338 (5th Cir. 2004)

(filthy cell conditions may constitute an Eighth Amendment violation).   "At a minimum, prison

officials must provide humane conditions of confinement and ensure that inmates receive

adequate food, clothing, shelter, and medical care.   They cannot deprive prisoners of the basic

elements of hygiene or the minimal civilized measure of life's necessities."   *Taylor v. Stevens*,

946 F.3d 211, 219 (5th Cir. 2019), *cert. granted, judgment vacated on other grounds, sub nom.*

*Taylor v. Riojas*, 592 U.S. ___, 141 S.Ct. 52 (2020) (citation and internal quotation marks

omitted).

In *Gates*, the Fifth Circuit cited favorably the holdings from other circuit decisions:

the Eighth Circuit has held that a prisoner being placed in a cell covered with filth
and human waste for a two-year period without proper cleaning supplies constitutes
cruel and unusual punishment. *Howard v. Adkison,* 887 F.2d 134, 137 (8th
Cir.1989) (recognizing that "inmates are entitled to reasonably adequate sanitation,
personal hygiene, and laundry privileges, particularly over a lengthy course of
time"); *see also McBride v. Deer,* 240 F.3d 1287, 1292 (10th Cir.2001) (holding

that three days in a feces-covered cell states a claim upon which relief could be granted).

*Id*.

Furthermore, there is an obvious Eighth Amendment violation when, for six full days, a prisoner is housed in a cell that is covered from floor to ceiling in massive amounts of feces, including inside the water faucet.  *Taylor v. Riojas*, 592 U.S. ___, 141 S.Ct. 52 (2020). Similarly, two weeks in a mold-infested cell, without cleaning supplies, likely is sufficient to state an Eighth Amendment violation.  *Hope v. Harris*, 861 Fed. App'x. 571, 582–84 (5th Cir. 2021), *cert. denied,* ___ U.S. ___, 143 S.Ct. 1746 (2023).

Nonetheless, a dirty cell does not automatically violate the Constitution.  *Taylor*, 946 F.3d at 220.   A "filthy, overcrowded cell . . . might be tolerable for a few days and intolerably cruel for weeks or months."  *Id*. (quoting *Hutto v. Finney*, 437 U.S. 678, 686–87, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978).   Thus, "a prisoner's three-day stay in a cell smattered with blood and excrement d[oes] not offend the Eighth Amendment—at least where the prisoner [is] given the chance to clean the cell."  *Id*. (citing *Davis v. Scott*, 157 F.3d 1003, 1005-6 (5th Cir. 1998). Indeed, there is no constitutional violation when the prison provides alternative cleaning supplies to disinfect the cell and toilets, such as a mop bucket and water.  *Bustinza v. Lucio*, No. 22-40312, 2023 WL 3019690, at *2 (5th Cir. Apr. 20, 2023).

In this case, DeRamus admitted that mini-bars of soap were available to him for showering upon request.   There also is no evidence that he was prohibited from taking the bars of soap to his cell.   Furthermore, he received toilet paper "and things of that nature." (DeRamus Depo., pgs. 105-106).   Consequently, DeRamus could have combined the sink water, the soap, and toilet paper to clean and wipe off the dried feces that was splattered on the wall of

the front, right portion of his cell.   While the undersigned certainly does not find this option to be ideal or without difficulty, the materials plainly have more sanitizing properties than the mere bucket of water that passed constitutional muster in *Bustinza*.

As to DeRamus's alleged inability to clean his lone jumpsuit while in segregation, he conceded that he could have sent it out for laundry, but then he would have had nothing to wear in the meantime.   There is no evidence that DeRamus lacked a bedsheet or blanket that he could have used to improvise a makeshift covering while he waited for his laundry to return.   In addition, for most of his entire stay in segregation, he remained alone in the cell.

Alternatively, and certainly again, not optimally, DeRamus could have used the mini-bar of soap, that he conceded was available upon request, to scrub the dirtiest parts of his jumpsuit in either the cell sink or the shower.   *See Daigre,* 719 F.2d at 1313 (where prisoner alleged unsanitary conditions as a result of infrequent washing of blankets and failure to provide soap and towels in individual cells, conditions were not inhumane because they were "reasonably sanitary" and inmates could shower with soap each morning).

Under these circumstances, Defendants' failure to provide DeRamus with a change of clothing did not transgress the Constitution.   *See Johnson v. Texas Bd. of Criminal Justice*, 281 Fed. App'x. 319, 322 (5th Cir. 2008) (provision of unclean clothing did not violate the Eighth Amendment where prisoner could wash the clothing in a small wash basin and toilet in his cell); *DeGrate v. Mayo*, Civ. Action No. 10-1010, 2010 WL 5664954, at *1 (W.D. La. Nov. 17, 2010), *R&R adopted,* 2011 WL 320203 (W.D. La. Jan. 28, 2011) (no cognizable Eighth Amendment claim where prisoner was given old clothes, no underwear, towels, soap, tissue paper, tooth brush, or toothpaste for "thirty teen days").

Finally, the undersigned finds that Defendants' failure to provide DeRamus with a toothbrush and toothpaste does not amount to a constitutional violation, where, as here, he was able to rinse his mouth with potable water from the cooler and he did not suffer any associated tooth decay. *See DeGrate, supra*; *Matthews v. Murphy*, 956 F.2d 275 (9th Cir. 1992) (no Eighth Amendment violation where prisoner was deprived of a towel, toothbrush, toothpowder, comb, soap, and other personal hygiene items for approximately 34 days).

In sum, after accepting DeRamus's evidence as credible and drawing all justifiable inferences in his favor, the undersigned nonetheless concludes that his hygiene-related deprivations do not amount to cruel and unusual punishment in violation of the Eighth Amendment. *See* discussion, *supra*. Of course, this decision is influenced by the circumstances and present posture of the case, where DeRamus admittedly remained healthy during the relevant period, *see* DeRamus Depo., pg. 50, and no longer faces exposure to the conditions. Should these conditions persist at the CPDC, it would behoove the Sheriff to redress them expeditiously.

## <u>Conclusion</u>

For the above-assigned reasons, the court finds, pursuant to Rule 56 of the Federal Rules of Civil Procedure, that there is no genuine dispute of material fact and that Defendants are entitled to judgment as a matter of law. Accordingly,

IT IS RECOMMENDED that the motion for summary judgment [doc. # 44] filed by Defendants, Claiborne Parish Sheriff Sam Dowies, Dusty Williams, and Bobby Morgan be GRANTED, and that Plaintiff Darryl DeRamus's claims for compensatory, punitive, and nominal damages against said Defendants, in their several capacities, be DISMISSED, with

prejudice, and his claims for injunctive and declaratory relief be DISMISSED, without prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.C.P. Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.   A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof.   A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing.   Timely objections will be considered by the District Judge before she makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, on this 3rd day of December, 2023.

KAYLA DYE MCCLUSKY
UNITED STATES MAGISTRATE JUDGE